**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**
Hadjar Anahita Ohadi (SBN 358387)
9800 Wilshire Blvd
Beverly Hills, CA 90212
Tel: (213) 871-7788
Email: aohadi@rcornishlaw.com

*Attorneys for Plaintiff*
*Frances Page De La Harpe*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

FRANCES PAGE DE LA HARPE,

Plaintiff,

v.

GRANT KING; RICHARD HEYMAN; HOLLYWOOD INTERNATIONAL REGIONAL CENTER, LLC; HOLLYWOOD INTERNATIONAL REGIONAL CENTER SELMA, LLC; 6417 DREAM LENDER LP, both directly and derivatively; HIRC 6417 DREAM LENDER GP, LLC; 6417 SELMA HOTEL, LLC; FIVE CHAIRS, LLC; RELEVANT GROUP, LLC; and DIGITALBRIDGE GROUP, INC. individually and as successor-in-interest to COLONY CAPITAL, LP (f/k/a COLONY CAPITAL, INC.),

Defendants.

Case No.: 2:26-cv-09582

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Frances Page De La Harpe ("Plaintiff"), by and through her undersigned counsel, brings this Complaint against Defendants Grant King ("King"), Richard Heyman ("Heyman"), Hollywood International Regional Center LLC ("HIRC"), Hollywood International Regional Center Selma LLC ("HIRC Selma"), 6417 Dream Lender LP, both directly and derivatively (the "Partnership"), HIRC 6417 Dream Lender GP, LLC (the "General Partner"), 6417 Selma Hotel, LLC (the "Borrower"), Five Chairs, LLC ("Five Chairs"), Relevant Group, LLC (the "Developer" or "Relevant Group"), and DigitalBridge Group, Inc., individually and as successor-in-interest to Colony Capital, LP (f/k/a Colony Capital, Inc.) ("DigitalBridge") (collectively, "Defendants"), and alleges as follows:

**INTRODUCTION**

1. Defendants raised approximately $37.5 million from 96 foreign investors through the EB-5 immigrant investor program to finance the Dream Hollywood Hotel, a 179-room luxury hotel at 6417 West Selma Avenue in Hollywood, California, together with the Tao Restaurant and Avenue Nightclub (collectively, the "Project"). The Dream Hollywood opened in July 2017. But the Project was burdened by an over-leveraged capital structure that Defendants worsened through years of mismanagement, material disclosure failures, self-dealing, and conflicts of interest. Ultimately, investors received no return of their investment and instead saw substantially all of the equity securing their $37.5 million loan extinguished through a deed in lieu of foreclosure.

2. Plaintiff invested $500,000 of at-risk capital, plus a $55,000 administrative fee, in 6417 Dream Lender LP (the "Partnership"), a California limited partnership, in reliance on offering materials authored, approved, or disseminated by Defendants. Those materials included a Confidential Private Offering Memorandum dated September 15, 2016 (the "PPM"), the Limited Partnership Agreement, Subscription Agreement and escrow instructions, the October 26, 2016 Loan Agreement and its amendments, investor communications,

and economic and job-creation reports.

3. As alleged below, Defendants made materially false and misleading statements and omitted material facts concerning, among other things, the Project's capital structure, financial condition, refinancing risk, regional-center compliance, and the resolution of the senior lender's foreclosure action. Defendants concealed the Project's deteriorating financial condition while continuing to extract fees and maintain control; terminated the regional center without adequate protection for investors; and negotiated a deed-in-lieu and contingent-payment-right resolution while operating under material conflicts of interest and favoring their relationships with the senior lender over the interests of investors.

4. The Dream Hollywood's loss followed the loss of two related Hollywood hotels, the Tommie and the Thompson, through foreclosure proceedings involving mezzanine lenders. All three projects were developed within Grant King and Relevant Group's EB-5-financed Hollywood hotel portfolio. The repeated loss of these properties after substantial EB-5 fundraising supports Plaintiff's allegations that Defendants employed a common course of conduct involving excessive leverage, inadequate capitalization, conflicted management, and material disclosure failures.

5. Plaintiff therefore seeks rescission and damages under the Securities Exchange Act of 1934 and applicable California law, together with equitable relief including an accounting, appointment of a receiver over HIRC, and imposition of a constructive trust, as well as punitive damages against those Defendants whose conduct was malicious, oppressive, or fraudulent.

## **<u>JURISDICTION AND VENUE</u>**

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), because Plaintiff asserts claims arising under the Exchange Act, including Section 10(b) and Rule 10b-5, Section 20(a), and Section 29(b), 15 U.S.C. §§ 78j(b),

78t(a), and 78cc(b).

7. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a).

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1391(b)(2), because Defendants transacted business and committed acts and transactions giving rise to Plaintiff's claims in this District, and a substantial part of the events, omissions, and property giving rise to this action are located in this District. The Project is located at 6417 West Selma Avenue, Hollywood, California 90028, within the Central District of California.

## **PARTIES**

9. Plaintiff Frances Page De La Harpe ("Plaintiff") is an individual domiciled in Los Angeles, California. Plaintiff is a limited partner and investor in Defendant 6417 Dream Lender LP.

10. Defendant 6417 Dream Lender LP (the "Partnership") is a California limited partnership through which Plaintiff and other EB-5 investors invested in the Project. The Partnership made the EB-5 loan to Defendant 6417 Selma Hotel, LLC.

11. Defendant HIRC 6417 Dream Lender GP, LLC (the "General Partner") is a California limited liability company, the general partner of the Partnership, and was responsible for the management and operation of the Partnership.

12. Defendant 6417 Selma Hotel, LLC (the "Borrower") is a Delaware limited liability company and California out-of-state limited liability company that owned and developed the Dream Hollywood Hotel and was the borrower and recipient of the Partnership's EB-5 loan proceeds.

13. Defendant Hollywood International Regional Center, LLC ("HIRC") is a Delaware limited liability company and California out-of-state limited liability company that served as the USCIS-designated EB-5 regional center sponsoring the Partnership and the Project.

14. Defendant Hollywood International Regional Center Selma, LLC

("HIRC Selma") is a Delaware limited liability company that served as manager of the Borrower and as Pledgor under the Loan Agreement.

15. Defendant Five Chairs, LLC ("Five Chairs") is a California limited liability company affiliated with HIRC and the General Partner and controlled by Defendants Grant King and Richard Heyman.

16. Defendant Relevant Group, LLC ("Relevant Group") is a Delaware limited liability company and a California out-of-state limited liability company. It is the real estate development firm that developed the Dream Hollywood Hotel and related Hollywood hotel projects.

17. Defendant Grant King ("King") is an individual residing in La Quinta, California, and a principal of Five Chairs, HIRC, the General Partner, and Relevant Group.

18. Defendant Richard Heyman ("Heyman") is an individual residing in Los Angeles, California and a principal of Five Chairs, HIRC, and Relevant Group.

19. Defendant DigitalBridge Group, Inc. ("DigitalBridge"), formerly known as Colony Capital, Inc., is a Maryland corporation and the successor in interest to Colony Capital, LP. Colony Capital, Inc. assumed all liabilities and obligations of Colony Capital, LP in connection with the January 2017 merger and thereafter changed its corporate name to DigitalBridge Group, Inc., effective June 22, 2021. Plaintiff alleges that DigitalBridge, as successor in interest to Colony Capital, LP, and/or its Colony-affiliated entities participated in the ownership, governance, or control of Relevant Group and the Project, as alleged more fully below.

## TOLLING AND DELAYED DISCOVERY ALLEGATIONS

20. Plaintiff invokes the discovery rule and the doctrine of fraudulent concealment, to the extent applicable. Defendants controlled material information concerning the Project's financial condition, debt obligations, collateral value, foreclosure risk, regional-center status, and negotiations concerning the deed in lieu

of foreclosure and contingent payment right ("CPR"), while withholding material information necessary for Plaintiff to discover the nature and extent of the misconduct alleged herein.

21. Plaintiff did not discover, and in the exercise of reasonable diligence could not have discovered, the facts giving rise to her claims until on or about January 9, 2026. Before that time, Defendants failed or refused to provide material books, records, financial statements, and other information concerning the Project's true financial condition and continued to omit or conceal material facts concerning its debt-service burden, lack of distributable cash flow, deteriorating collateral value, foreclosure risk, and the terms and consequences of the deed-in-lieu resolution.

22. On or about January 9, 2026, following the closing of the Deed in Lieu of Foreclosure Agreement, Plaintiff received an investor update disclosing the CPR structure and its consequences for investors. That disclosure revealed material facts concerning the loss of the collateral securing the Partnership's loan and Defendants' handling of the Project that Plaintiff had not previously known and could not reasonably have discovered from the information Defendants had provided.

23. Accordingly, to the extent permitted by applicable law, the applicable limitations periods were delayed or tolled until Plaintiff discovered, or through reasonable diligence could have discovered, the facts giving rise to her claims.

24. Plaintiff further alleges that the fraudulent scheme continued through independently actionable deceptive acts and investor communications, including the March 2023 refinancing and Fourth Amendment communications, the 2025 regional-center and foreclosure-related communications, and the January 9, 2026 Deed in Lieu of Foreclosure/CPR transaction and investor update, which were acts in furtherance of the scheme and the last overt acts alleged. To the extent 28 U.S.C. § 1658(b)(2) applies, Plaintiff alleges that the Rule 10b-5(a) and (c) scheme-liability violation encompasses those independently actionable acts, not merely the initial 2017 misrepresentation; each such act triggers its own repose period.

25. To the extent any claim is based on a statement, omission, or deceptive act occurring within five years before the filing of this action in August 2026, that claim is independently timely.

26. Plaintiff further alleges that the post-purchase misrepresentations and omissions induced her to maintain her investment position and forgo available remedies, while also concealing the material risks that ultimately materialized.

**DERIVATIVE ALLEGATIONS (THE PARTNERSHIP)**

27. Plaintiff brings Count X derivatively on behalf of 6417 Dream Lender LP (the "Partnership") to enforce rights belonging to the Partnership and to recover assets, proceeds, and other relief for injuries sustained by the Partnership as a result of the conduct alleged herein.

28. Plaintiff has been a limited partner of the Partnership continuously since approximately December 6, 2017, was a limited partner at the time of the conduct challenged in Count X, and remains a limited partner at the commencement of this action. Plaintiff fairly and adequately represents the interests of the Partnership and similarly situated limited partners in enforcing the Partnership's rights. This action is not collusive or brought for the purpose of conferring jurisdiction that this Court would otherwise lack.

29. Plaintiff did not make a pre-suit demand upon Defendant HIRC 6417 Dream Lender GP, LLC (the "General Partner") because such demand would have been futile. The General Partner is the Partnership's sole general partner and is controlled by Defendants whose conduct is the subject of the derivative claim. Those persons and entities participated in, approved, or implemented the challenged transactions and would be required to cause the Partnership to pursue claims against themselves and affiliated entities.

30. Demand would further have been futile because the General Partner, acting through King and affiliated Defendants, approved and implemented the January 2026 deed-in-lieu and CPR transaction challenged herein, including a

release-and-no-sue provision alleged to restrict the Partnership's ability to pursue claims arising from the Project. The General Partner and its controlling persons therefore have disabling interests in the subject matter of the derivative claim and cannot impartially determine whether the Partnership should pursue the claims asserted in Count X. Their refusal to provide Plaintiff with material Partnership books, records, financial information, and an accounting further demonstrates that a demand seeking affirmative action against those same persons and affiliates would have been futile.

## STATEMENT OF FACTS

### A. The EB-5 Immigrant Investor Program

31. The EB-5 immigrant investor program, codified at 8 U.S.C. § 1153(b)(5), provides eligible foreign investors a pathway to lawful permanent residence through investment in a new commercial enterprise that creates at least 10 full-time jobs for qualifying U.S. workers. At the time of Plaintiff's investment in 2017, the minimum qualifying investment in a Targeted Employment Area was $500,000. Investments made through a USCIS-designated regional center could satisfy applicable job-creation requirements through qualifying direct and indirect job creation demonstrated by accepted economic methodologies.

32. Defendant Hollywood International Regional Center LLC ("HIRC"), USCIS Regional Center No. 1031910084, served as the USCIS-designated regional center sponsoring the Partnership and the Project. At the time Plaintiff invested, she was a citizen of the Republic of South Africa seeking immigration benefits through the EB-5 program and invested $500,000 of at-risk capital in the Partnership for that purpose.

33. For investors such as Plaintiff, the financial investment and the immigration process were intertwined. EB-5 investors were required to maintain their qualifying investment at risk for the applicable sustainment period and demonstrate the required job creation before the conditions on their permanent-

resident status could be removed. As alleged below, Defendants knew that Plaintiff and other EB-5 investors depended upon the continued compliance of the Partnership and Project with EB-5 requirements and exploited that dependence to discourage scrutiny and investor action as the Project's financial condition deteriorated.

**B. The Dream Hollywood Project and Its Capital Structure**

34. 6417 Dream Lender LP (the "Partnership") was formed on August 12, 2016 as a California limited partnership to raise EB-5 capital and lend the proceeds to 6417 Selma Hotel, LLC (the "Borrower"), the Project's job-creating enterprise. The loan proceeds were intended to pay down existing senior debt and finance completion of the Dream Hollywood Hotel, a 179-room hotel located at 6417 West Selma Avenue in Hollywood, California, together with the approximately 20,000-square-foot Tao Restaurant and 4,000-square-foot Avenue Nightclub (collectively, the "Project"). Relevant Group served as the Project's developer.

35. The Confidential Private Offering Memorandum dated September 15, 2016 (the "PPM") initially contemplated raising a target of $20 million and a maximum of $44 million through the sale of limited-partnership interests at $500,000 per investor, corresponding to a target of 40 and a maximum of 88 EB-5 investors. The PPM represented that the Project's aggregate funding requirements were approximately $96.4 million.

36. Under the Loan Agreement dated October 26, 2016, the Partnership agreed to advance up to $44 million to the Borrower at an interest rate of 6.5% per annum. The Partnership's loan was subordinate to senior indebtedness, including a senior loan of approximately $40.85 million that had closed with Wells Fargo Bank, N.A. on December 30, 2015, and was secured by the collateral described in the Loan Agreement and related pledge documents. Defendant Hollywood International Regional Center Selma LLC ("HIRC Selma") served as manager of the Borrower and as Pledgor in connection with the EB-5 loan.

37. The entities responsible for raising, administering, lending, and deploying the EB-5 capital were under overlapping ownership and management. Five Chairs, LLC ("Five Chairs"), controlled by Grant King and Richard Heyman, owned or controlled HIRC and the General Partner; HIRC 6417 Dream Lender GP, LLC served as the Partnership's General Partner; HIRC sponsored the Project as its EB-5 regional center; HIRC Selma managed the Borrower; and Relevant Group developed the Project. These overlapping roles placed King, Heyman, and their affiliated entities on multiple sides of the EB-5 transaction and created conflicts between the interests of the Partnership and its limited partners and the interests of the affiliated entities managing, developing, and financing the Project.

**C. Plaintiff's Investment**

38. On or about December 6, 2017, Plaintiff subscribed for a limited-partnership interest in 6417 Dream Lender LP pursuant to the September 15, 2016 PPM, the Limited Partnership Agreement, the Subscription Agreement, and related escrow and offering materials. Plaintiff contributed $500,000 in at-risk EB-5 capital and paid an additional $55,000 Administrative Fee, for a total payment of $555,000, which was deposited into escrow in accordance with the offering documents.

39. Plaintiff made her investment in reliance on the PPM, Limited Partnership Agreement, Loan Agreement, and related offering materials concerning the structure, capitalization, use of proceeds, administration, and repayment of the EB-5 investment. Among other things, those materials represented that: (a) Plaintiff's EB-5 capital would be loaned to the Borrower and used for qualifying Project expenditures, with non-qualifying expenditures funded from other sources; (b) the Partnership and Project would maintain books, records, financial controls, and reporting sufficient to safeguard and account for investor funds; (c) the Project would be funded through the sources of capital and financing described in the offering materials; and (d) repayment of the Borrower's loan would provide the source for the return of Plaintiff's capital and any investment return, subject to the

terms and risks disclosed in the offering materials.

**D. The Project's Operations, Refinancings, and Increasing Leverage**

40. The Dream Hollywood officially opened on July 12, 2017 with 178 guest rooms. The Borrower owned the Project, Relevant Group served as its developer, and Dream Hotel Group operated the hotel under the Dream Hollywood brand. Tao Group operated the Project's principal food, beverage, and nightlife venues, including Tao Restaurant, Avenue, Beauty & Essex, and The Highlight Room.

41. A 2023 economic report prepared by Barnhart Economic Services concluded that the Project had generated approximately 2,653 qualifying jobs—approximately 2,273 from development expenditures and 380 from operations—substantially exceeding the EB-5 job-creation requirement applicable to the investors identified in the report. Thus, unlike Defendants' Tommie Hotel project, the principal injury alleged here did not arise from a failure to generate sufficient qualifying jobs, but from the financial structure, management, and ultimate loss of the collateral supporting the EB-5 investment.

42. The EB-5 Loan was amended four times between 2018 and 2023 as the Project's financing structure evolved. The First Amendment, dated January 23, 2018, and Second Amendment, dated August 2, 2018, modified provisions of the Loan Agreement. A Third Amendment followed in August 2020.

43. During the same period, the Project's senior indebtedness was repeatedly refinanced. In 2019, Relevant Group obtained approximately $61 million in refinancing from Wells Fargo secured by the Dream Hollywood Hotel and related Project assets. By March 2023, that financing was again replaced when LCP Hollywood Lender, LLC, a joint venture involving LCP Group and Safanad, provided a new $33.3 million senior mortgage loan to refinance existing Project debt and fund reserves.

44. In connection with the March 2023 refinancing, the parties executed a

Fourth Amendment to the EB-5 Loan Agreement dated March 17, 2023. At that time, approximately $37.5 million in EB-5 Loan principal remained outstanding. The Fourth Amendment extended the EB-5 Loan's maturity date to April 1, 2028 and materially altered its interest-payment structure. Instead of the original 6.5% annual interest rate being payable under the prior structure, only 0.5% per annum was designated as "Current Interest" payable quarterly, while the remaining 6.0% accrued as deferred interest payable at maturity.

45. The Fourth Amendment therefore substantially reduced the cash interest payable on the $37.5 million EB-5 Loan during its extended term and deferred the overwhelming majority of the contractual interest until maturity. As alleged below, Defendants did not adequately disclose to Plaintiff the financial condition necessitating that restructuring, the Project's ability to satisfy the accumulating deferred obligation at maturity, or the increased risk to the Partnership resulting from extending a subordinated $37.5 million loan behind newly refinanced senior indebtedness.

46. The 2023 restructuring also occurred while control over the entities responsible for protecting the EB-5 investors remained concentrated among affiliated Defendants. By this period, sole management authority over HIRC had passed to an entity controlled by King, as reflected in the governing transaction documents. King and the affiliated entities he controlled therefore remained positioned to participate in material decisions concerning the Partnership, the Borrower, the Project's financing, and communications to the limited partners.

47. Separately, on February 2, 2023, Hyatt Hotels Corporation completed its acquisition of Dream Hotel Group's brand and management platform for approximately $125 million in cash, with up to an additional $175 million in contingent consideration. The transaction concerned the Dream Hotel Group platform and did not itself constitute a sale of the Dream Hollywood real estate or repayment of the Partnership's EB-5 Loan.

48. By late 2023 or early 2024, the General Partner informed investors that "all cash flow generated from the Hotel is currently allocated to service the outstanding loans." The Project therefore was generating no cash available for distributions on the EB-5 investment. That disclosure, following the Fourth Amendment's reduction of current interest to 0.5% and deferral of the remaining 6.0%, revealed the extent to which the Project's operating cash flow was burdened by its debt structure and materially increased the risk that the Partnership would be unable to recover principal and accrued interest from the Borrower.

**E. HIRC's Decision to Terminate Its Regional Center Status**

49. On October 1, 2025, HIRC issued a notice to investors, Paragon Principal Capital, and Plaintiff's immigration counsel, signed by Defendant Grant King, stating that HIRC had elected not to continue complying with requirements imposed by the EB-5 Reform and Integrity Act of 2022 ("RIA"), including payment of the annual EB-5 Integrity Fund fee, and that HIRC consequently expected its USCIS regional-center designation to be terminated. The notice represented that such termination "should have no adverse effect" on the immigration eligibility of pre-RIA investors, citing INA § 203(b)(5)(M) and USCIS guidance.

50. The October 1, 2025 notice further informed investors that the Partnership would not associate with a replacement regional center. At the same time, HIRC disclosed that other affiliated EB-5 new commercial enterprises had arranged for replacement regional-center sponsorship, including through Delvelyn Regional Center, LLC. HIRC did not explain why replacement sponsorship was arranged for those affiliated investments but not for 6417 Dream Lender LP, or disclose any analysis comparing the costs, benefits, risks, or alternatives associated with the different treatment.

51. By this time, management authority over HIRC had been placed under an entity controlled by King, as reflected in the governing transaction documents. King and the affiliated Defendants made the decision to discontinue HIRC's

regional-center compliance without seeking a vote of the Partnership's limited partners or meaningful consultation with them and without providing investors any contemporaneous financial or other analysis supporting the decision.

52. Although federal law and USCIS guidance provide protections for certain good-faith pre-RIA investors following termination of a regional center, those protections did not eliminate the significance of Defendants' decision to cease HIRC's compliance, permit its designation to terminate, and decline replacement regional-center sponsorship for the Partnership while arranging such sponsorship for certain affiliated investments. As alleged below, the decision formed part of a broader course of conduct in which Defendants exercised unilateral control over matters affecting the Partnership while withholding from limited partners the information necessary to evaluate those decisions and protect their interests.

**F. The Default, Foreclosure, and Deed in Lieu of Foreclosure**

53. By 2025, the Project had defaulted on its senior indebtedness to LCP Hollywood Lender, LLC ("LCP"). In August 2025, LCP noticed a public sale under Article 9 of the Uniform Commercial Code of pledged equity interests associated with the hotel and restaurant ownership entities. The notice identified outstanding principal of approximately $30.3 million, plus unpaid interest, attorneys' fees, and other charges, and scheduled the public sale for October 17, 2025. The contemplated sale was subsequently adjourned or cancelled and did not proceed to a public auction.

54. Rather than permit the scheduled foreclosure process to proceed, Defendants and LCP negotiated a deed-in-lieu resolution. On or about January 9, 2026, the Deed in Lieu of Foreclosure Agreement (the "DIL") closed, resulting in LCP or its affiliates acquiring ownership and control of the Dream Hollywood Project in satisfaction or resolution of the senior indebtedness. By the time of the transfer, the outstanding senior debt, accrued interest, fees, and costs had grown to approximately $38 million.

55. The DIL eliminated substantially all of the ownership value underlying the collateral securing the Partnership's subordinated $37.5 million EB-5 Loan. The Partnership received no repayment of its outstanding principal at closing, and Plaintiff received no return of her $500,000 capital contribution.

56. In connection with the DIL, Defendants negotiated a Contingent Payment Right Agreement (the "CPR") intended to provide a potential source of future recovery following a subsequent disposition of the Project. Under the CPR, 6417 Selma Hotel, LLC was designated as payee, and no payment became due merely upon execution of the DIL. Instead, any future payment depended upon the occurrence and economics of a qualifying future sale or other disposition of the Project.

57. Under the CPR's payment formula, the contingent payment was limited to the lesser of: (a) 20% of specified net proceeds remaining after deductions that included the senior loan balance, transaction costs, reserves, a 0.75% exit fee, and amounts necessary for the senior lender to achieve a 14% internal rate of return; or (b) $85.5 million, subject to reduction by amounts previously paid under the agreement. Thus, recovery for the Partnership depended upon a future disposition producing proceeds sufficient first to satisfy the lender's debt, costs, contractual return, and other deductions specified in the CPR.

58. The CPR therefore substituted a contingent and subordinated right to possible future proceeds for the Partnership's previously outstanding $37.5 million loan and its collateral. Neither the January 2026 closing nor the CPR provided Plaintiff or the Partnership with an immediate recovery of the outstanding EB-5 principal. Any future recovery depended upon the Project's subsequent value, the timing and terms of a future disposition, and satisfaction of the contractual deductions and return thresholds benefiting the senior lender.

59. The DIL and CPR also contained a release-and-no-sue mechanism affecting claims against the senior lender and related parties. Under that provision,

an EB-5 investor who pursued specified claims against protected parties risked forfeiting rights associated with the contingent payment arrangement. The provision therefore required investors to choose between preserving potential CPR recovery and pursuing claims falling within the provision's scope.

60. Grant King participated in the negotiation and approval of the DIL/CPR resolution on behalf of the affiliated Project entities and, in January 2026, signed the investor communication informing limited partners of the transaction and its consequences. The General Partner did not seek approval of the DIL/CPR structure from the limited partners before agreeing to a resolution that extinguished the Project equity underlying the Partnership's collateral, replaced immediate repayment with a contingent future recovery mechanism, and restricted the pursuit of specified claims.

61. Defendants negotiated and approved the DIL/CPR structure while operating under the overlapping roles and conflicts alleged above. King and the General Partner were responsible for protecting the Partnership's interests while King and his affiliated entities also had interests arising from their ownership, management, development, and lending relationships concerning the Project. Defendants did not disclose to Plaintiff any independent evaluation of alternatives to the DIL, valuation of the Partnership's claims or collateral, analysis of the CPR's expected value, or assessment by an independent fiduciary of whether the transaction was fair to the Partnership and its limited partners.

62. On or about January 9, 2026, King informed investors that the DIL had closed and disclosed the CPR structure. This was the first time Plaintiff learned the material terms by which the Project would be surrendered to the senior lender without repayment of the Partnership's outstanding principal and the Partnership's prospect of recovery would instead depend upon the contingent-payment arrangement described above.

**G. Related EB-5-Financed Hotel Projects and Foreclosures**

63. The Dream Hollywood was one of several Hollywood hotel projects

developed by Relevant Group and its principals using EB-5 capital. Relevant Group also developed the nearby Thompson Hollywood at 1541 Wilcox Avenue and Tommie Hollywood at 6516 Selma Avenue. Contemporary reporting identified the Dream, Thompson, and Tommie as Hollywood hotels financed through the EB-5 program.

64. The Thompson and Tommie encountered substantial construction delays, cost overruns, and financing pressures before obtaining approximately $72 million in mezzanine financing in 2021. In February 2023, after the mezzanine lender exercised remedies against the pledged ownership interests, Relevant Group lost control of both hotels through foreclosure. The mezzanine lenders thereafter acquired the properties.

65. Those losses preceded the 2025 default and January 2026 deed-in-lieu transaction involving the Dream Hollywood alleged above. Thus, within approximately three years, Relevant Group and King lost control of the Thompson, Tommie, and Dream Hollywood hotels through foreclosure proceedings or a negotiated transfer in lieu of foreclosure. Each project formed part of Relevant Group's concentrated Hollywood hotel-development strategy, and each involved overlapping principals and financing relationships.

66. Concerns regarding Relevant Group's use of EB-5 financing had arisen before those losses occurred. On October 20, 2021, UNITEHERE! Local 11[1] wrote to the Director of USCIS requesting that the agency examine Relevant Group and its affiliates' use of the EB-5 program. Among other things, the union requested information concerning the amount of EB-5 capital raised for Relevant Group projects, the number of immigrant investors, job creation, project completion

---

[1] UNITEHERE! Local 11; Oct. 20, 2021, Letter to USCIS, https://www.unitehere11.org/wp-content/uploads/Relevant-Group-EB5-letter-FINAL.pdf

timelines, and the involvement of Colony NorthStar or related personnel in EB-5 fundraising.

67. The October 2021 letter also cited Relevant Group marketing materials stating that, by 2018, Relevant had raised more than $250 million in lower-cost Chinese capital for its Hollywood development portfolio and identified Colony NorthStar's minority investment in Relevant Group and Colony-related participation in Relevant's management and fundraising network. These allegations are relevant to Defendants' knowledge of contemporaneous questions concerning the structure, financing, and administration of their EB-5 projects.

68. The subsequent loss of the Thompson and Tommie through foreclosure, followed by the Dream Hollywood's default and deed in lieu of foreclosure, is consistent with Plaintiff's allegation that the Dream's failure was not an isolated event. As alleged herein, the three projects shared Relevant Group as developer, overlapping control persons, substantial leverage, and reliance on EB-5 capital. Plaintiff alleges that this recurring pattern, considered together with the Project-specific facts alleged above, supports an inference that Defendants knew or were reckless in disregarding the risks created by their financing, management, and disclosure practices.

## PARTICULARIZED ALLEGATIONS OF FALSE AND MISLEADING STATEMENTS

69. In December 2017, in connection with Plaintiff's subscription to the Partnership, Plaintiff received the Investor Packet, including the Confidential Private Offering Memorandum ("PPM"), Limited Partnership Agreement, Subscription Agreement, Loan Agreement, and related materials. HIRC and the General Partner distributed or caused these materials to be distributed to Plaintiff in connection with her investment. King, acting on behalf of HIRC and the General Partner, signed or approved certain of those materials, including the PPM and Loan Agreement. Defendants thereafter communicated with Plaintiff through investor updates

concerning the Project, its finances, and the status of the EB-5 Loan. The specific statements and omissions alleged below identify the speaker, communication, subject matter, and basis for falsity.

**A. Statements Regarding the Use of EB-5 Funds and Internal Controls**

70. HIRC, the General Partner, and King—who personally signed the PPM and Loan Agreement—represented in the Confidential Private Offering Memorandum dated September 15, 2016 and the Limited Partnership Agreement of the same date that EB-5 capital would be used "in its entirety, as per USCIS regulations, for the project's development budget," with non-qualifying expenses such as regional center fees, interest, origination costs, investor marketing, and broker fees to be "covered by administrative fees, developer equity, or other non-EB-5 sources." The materials further represented that HIRC and the General Partner would maintain books and accounts, prepare annual reports, provide timely tax reporting, and exercise banking oversight sufficient to prevent commingling, with internal controls appropriate to a project of this size. Plaintiff received these representations in connection with her December 2017 subscription, and relied on these representations in subscribing and paying, among other amounts, a $55,000 Administrative Fee specifically represented as a source for expenses that would not be charged against EB-5 capital.

71. These statements were false and misleading because Defendants never implemented the controls they promised: books and accounts were not maintained in an organized manner, financial statements and tax documents were not timely or accurate, and no meaningful banking oversight existed to segregate EB-5 proceeds from other funds flowing through the Project's vertically integrated entity structure. Rather than functioning as a firewall protecting EB-5 capital, the promised "internal controls appropriate to a project of this size" were nonexistent in practice, allowing Defendants to authorize excessive administrative and management fees that depleted funds otherwise available for debt service and investor returns—precisely the

outcome the PPM's disclosures were designed to prevent. Defendants had every incentive to describe these controls as robust: by minimizing transparency and weakening oversight, they preserved discretionary control over EB-5 funds and concealed the Project's deteriorating finances, while King personally benefited by retaining control and extracting fees through Five Chairs, Relevant Group, and affiliated entities without ever being held accountable for the unsustainable capital structure he had helped create.

**B. Statements Regarding Budget and Capital Structure**

72. HIRC, the General Partner, King, and Heyman represented in the Confidential Private Offering Memorandum dated September 15, 2016 that "[t]he aggregate funding requirements for the Project are approximately $96.4 million," itemized across a capital stack comprising a Senior Loan of approximately $40,850,000, EB-5 capital of up to $44,000,000, and developer equity, and further represented that construction of the Hotel, Restaurant, and Nightclub components would be completed and open for operations by December 2016. Plaintiff received these representations in connection with her December 2017 subscription.

73. Both figures proved unreliable. Contemporaneous trade-press reporting placed the completed Project's actual cost at approximately $110 million at the time of its 2017 opening—a roughly 14% variance above the PPM's $96.4 million estimate that Defendants, as the entities and individuals who controlled every phase of construction and disbursement, were uniquely positioned to know and correct before repeating the figure to investors. The Hotel did not open until July 12, 2017, roughly seven months after the December 2016 target Defendants had represented, a schedule slippage Defendants likewise never disclosed or corrected in subsequent investor communications. More fundamentally, the capital structure as represented was dangerously over-leveraged from inception: with a senior loan of approximately $40.85 million and an EB-5 loan of up to $44 million layered onto a single 179-room hotel generating finite cash flow, the debt-to-equity ratio left virtually no margin for

the cost and schedule variance that in fact materialized. Defendants failed to disclose that the capital structure's viability depended entirely on sustained high occupancy and revenue growth, and that any market disruption or operational shortfall—let alone the cost overrun and schedule delay ultimately realized—would render the Project unable to service both senior and subordinated debt, a foreseeable risk that the sister Tommie Hotel project, developed by the same control persons using the same offering architecture, had already demonstrated could materialize catastrophically. Defendants had every incentive to represent the capital structure as viable: EB-5 subscriptions generated immediate fee revenue of $55,000 per investor in Administrative Fees alone, plus ongoing management fees, and provided King and Relevant Group with the capital necessary to complete and maintain control over the Project.

**C. Statements Regarding Refinancing and Debt Risk**

74. In connection with the Fourth Amendment to the Loan Agreement, dated March 17, 2023, King and the General Partner represented that the new $33.3 million senior loan from LCP Hollywood Lender, LLC and the restructured EB-5 Loan terms—extending maturity to April 1, 2028 and reducing current interest from 6.5% to 0.5% per annum—provided a viable path to repayment of investor capital, and investor communications issued in 2023 and 2024 represented that the Project remained operational and that the restructuring provided time to stabilize operations and achieve refinancing or sale.

75. These representations were false and misleading because Defendants knew, or recklessly disregarded, facts that made the represented "path to repayment" illusory rather than real. The reduction of current interest to near-zero did not reflect a negotiated accommodation; it reflected the fact that the Project could not service meaningful debt from operations at all. The new senior lender's 14% internal rate of return hurdle, layered on top of a senior loan balance that would grow to approximately $38 million, meant that any future sale would need to generate more

than $5.3 million in annual return to the senior lender before a single dollar could reach subordinated EB-5 investors—a mathematical reality Defendants did not disclose when touting the restructuring as a path to recovery. By late 2023, Defendants' own investor update admitted that "all cash flow generated from the Hotel is currently allocated to service the outstanding loans," leaving nothing available for EB-5 interest or investor returns, yet Defendants continued to represent the Project as a going concern with prospects for investor recovery rather than disclosing that the debt-service arithmetic had already foreclosed any realistic prospect of repayment. Defendants had motive to maintain the appearance of viability: doing so avoided investor litigation, protected their ongoing management fees, and preserved their business relationships with the senior lender and other parties in the real estate community.

**D. Statements Regarding Regional Center Compliance and Termination**

76. On October 1, 2025, King, acting on behalf of HIRC, transmitted a notice stating that HIRC's termination of its regional center designation "should have no adverse effect" on pre-RIA investors' immigration eligibility, and separately reported that Dream Hollywood's Q4 2023–Q1 2024 occupancy of 64.25% and average daily rate of $254 compared favorably to a citywide Los Angeles average occupancy of 66.17% and ADR of $203.33, characterizing the Project as having "significant potential for improved occupancy rates" and reflecting a "strong recovery and growth trajectory."

77. Both statements were misleading. The termination statement omitted that HIRC would not engage a replacement regional center for the Dream Hollywood fund even though certain other HIRC-affiliated funds received exactly that protection, that the decision to terminate rather than comply with the RIA's Integrity Fee and audit requirements was being made contemporaneously with the senior lender's active foreclosure proceedings against the Project, and that termination could jeopardize the adjudication of investors' pending I-829 petitions—none of

which was disclosed alongside the bare assurance of "no adverse effect." The market-performance statement was misleading for a related but independent reason: publicly disclosed guidance from Host Hotels & Resorts, Inc., an SEC-reporting hotel REIT with comparable Los Angeles/Orange County assets, projected only 2.5% to 5.5% RevPAR growth for 2024, itself already down from 2.0% to 8.0% guided for 2023—a muted, single-digit growth environment that Defendants' framing of "significant potential" and a "strong recovery and growth trajectory" did not remotely reflect, particularly given that the Project's own occupancy of 64.25% was underperforming the citywide average despite its ADR premium. Defendants issued this optimistic narrative in the same period that the senior lender, LCP Group, initiated foreclosure proceedings in September 2025 alleging more than $30 million in unpaid debt—a temporal proximity that itself undercuts any claim that the "recovery and growth trajectory" language reflected Defendants' good-faith assessment of the Project's condition at the time it was made. King's decision to terminate HIRC rather than comply with the RIA was financially motivated: compliance would have required ongoing Integrity Fee payments and regulatory oversight that would have exposed Defendants' prior mismanagement and self-dealing across their portfolio of EB-5 funds, and by terminating rather than complying, King avoided the burden of RIA-mandated audits and disclosures at the precise moment such scrutiny would have been most revealing.

**E. Statements Regarding the Deed-in-Lieu/CPR Negotiation and Disclosures**

78. In the 6417 Dream Lender LP EB-5 Investor Update Letter dated January 9, 2026, signed by Grant King on behalf of the General Partner, Defendants disclosed the closing of the Deed in Lieu of Foreclosure and the creation of the Contingent Payment Right, representing this outcome as the best available result for investors and stating that the CPR provided "the opportunity for investors to share in future upside" from a qualifying sale of the property.

79. This representation was misleading because it cast as an opportunity what the underlying arithmetic renders remote at best. The senior debt alone stood at approximately $38 million—more than $200,000 per key across the Hotel's 178 rooms—and the CPR requires the senior lender to first recoup a 14% internal rate of return, a 0.75% exit fee, and all costs and reserves before any of the remaining 20% of net proceeds, capped at $85.5 million, becomes available to EB-5 investors. Given that structure, the prospect of Plaintiff recovering any meaningful portion of her $555,000 investment depends on a future sale generating proceeds well in excess of the outstanding debt and lender return hurdle—a contingency Defendants did not quantify or otherwise contextualize for investors even as they characterized it as "upside." The letter also omitted that King and the General Partner had negotiated the DIL and CPR without meaningful consultation with, or advance notice to, limited partners regarding the terms being negotiated on their behalf; that King's position as the fiduciary charged with protecting investor interests was irreconcilable with his need for the senior lender's continued cooperation to preserve his own business relationships and avoid personal liability; that the CPR's "release and no-sue" provision—forfeiting an investor's CPR rights upon initiating litigation against the lender—was included at the lender's insistence and without investor input; and that Defendants had rejected or failed to pursue alternative structures, such as negotiating a partial recovery directly or assigning the EB-5 loan to a third party, that might have preserved greater value for investors than a capped, contingent, and heavily subordinated payment right. King and the General Partner had every incentive to describe this outcome favorably: a cooperative, non-adversarial resolution preserved their standing within the real estate community, avoided exposure to personal guaranty claims or claw-back liability, and minimized the risk of further litigation against themselves, while the CPR's structure provided the appearance of continued upside potential even as, in substance, it extinguished investors' practical ability to recover their capital.

**STRONG INFERENCE OF SCIENTER**

80. The facts alleged above, considered collectively and in chronological context, give rise to a strong inference that King, HIRC, and the General Partner acted knowingly or with deliberate recklessness as to the falsity or misleading nature of the statements and omissions attributed to them.

81. At the time of Plaintiff's December 2017 investment, HIRC, the General Partner, and King knew or recklessly disregarded that material assumptions contained in the September 2016 PPM were no longer accurate. By then, the Hotel had opened approximately seven months later than the December 2016 date stated in the PPM, and the Project's completed cost materially exceeded the approximately $96.4 million funding requirement represented in the offering materials. These were not matters outside Defendants' access or control: HIRC and the General Partner managed the EB-5 investment structure, and King exercised control over the entities responsible for the Project's development, financing, and disbursements. Defendants nevertheless provided Plaintiff the outdated offering materials without disclosing or correcting the known cost and schedule deviations. The inference of knowledge or deliberate recklessness is therefore based not merely on Defendants' corporate positions, but on their direct responsibility for the very Project information that contradicted the representations communicated to Plaintiff.

82. By the March 2023 refinancing and thereafter, King and the General Partner possessed additional information demonstrating the deteriorating position of the EB-5 Loan. They negotiated or approved the Fourth Amendment and knew the new senior lender's priority, the approximately $33.3 million senior principal balance, the 14% internal-rate-of-return requirement, the extension of the EB-5 Loan to April 1, 2028, and the reduction of current EB-5 interest from 6.5% to 0.5%. They also knew from the Project's financial information that operating cash flow was insufficient to service the subordinated EB-5 debt; Defendants later acknowledged that all Hotel cash flow was being applied to outstanding loans. Those facts support

a strong inference that King and the General Partner knew, or were deliberately reckless in failing to disclose, the material limitations on investor repayment when communicating the restructuring and prospects for recovery.

83. Defendants' knowledge of those risks was reinforced by the 2023 foreclosure losses involving the Tommie and Thompson hotel projects, which were developed or managed by overlapping control persons and employed materially similar financing structures. Those events placed King and the entity Defendants on notice, no later than 2023, of the consequences that could follow when hotel operating revenues were insufficient to support senior and subordinated debt. Plaintiff relies on those events as additional circumstantial evidence of scienter for Defendants' subsequent representations concerning Dream Hollywood, not as evidence that Defendants necessarily possessed the same knowledge when Plaintiff invested in 2017.

84. By September and October 2025, the inference of scienter was stronger still. King and the General Partner knew that the senior lender had commenced foreclosure proceedings alleging more than $30 million in unpaid debt when Defendants continued to characterize the Project as having "significant potential for improved occupancy rates" and a "strong recovery and growth trajectory." King likewise knew the circumstances surrounding HIRC's termination because he acted on HIRC's behalf in communicating that termination and knew that no replacement regional center would be arranged for the Dream Hollywood fund. These contemporaneous facts were directly known to Defendants and materially qualified the more favorable descriptions communicated to investors.

85. By January 2026, King and the General Partner necessarily knew the material conditions governing the Deed in Lieu and CPR because they negotiated and approved those transactions. They therefore knew, before describing the CPR as an opportunity to participate in future "upside," that investor recovery was subordinated to approximately $38 million in senior debt, the senior lender's 14%

internal-rate-of-return requirement, exit fees, costs and reserves, and other contractual conditions; that the CPR contained a litigation-related forfeiture provision; and that investors had not meaningfully participated in negotiating those terms. Their direct participation in the transaction supports a strong inference that the omissions accompanying their description of the CPR were knowing or deliberately reckless.

86. Taken collectively, these allegations support an inference of scienter at least as compelling as an inference of mere negligence or inadvertence. The alleged misstatements and omissions concerned matters central to Defendants' own responsibilities—Project costs and completion, Partnership finances, debt-service capacity, refinancing terms, foreclosure, regional-center status, and the terms of the DIL and CPR—and were made or approved by persons who managed or negotiated those matters. The recurring failure to disclose known adverse facts while providing investors materially more favorable descriptions of the Project further supports the inference that the omissions were knowing or deliberately reckless rather than accidental.

87. Safe harbors for forward-looking statements do not apply here because Defendants lacked any reasonable basis for their representations regarding the Project's viability and investor recovery prospects, and because their cautionary language was generic and failed to disclose known, then-existing adverse facts. Plaintiff's claims are based substantially on misrepresentations or omissions concerning then-existing facts—including actual Project costs and delays, existing debt and repayment priority, then-current operating cash flow, pending foreclosure proceedings, regional-center termination, and the actual terms of the DIL and CPR—rather than merely on predictions of future performance. Defendants, by virtue of their malfeasance and reckless conduct, cannot claim any safe harbor regarding these matters.

## LOSS CAUSATION, RELIANCE, AND DAMAGES

88. Plaintiff actually and reasonably relied on the material representations and omissions in the offering materials provided to her in connection with her December 2017 subscription. Those representations concerned matters material to her investment decision, including the Project's cost and capitalization, the use and safeguarding of EB-5 funds, financial controls and reporting, and the Project's ability to support repayment of the EB-5 Loan. Had Plaintiff known the material facts alleged above—including the Project's actual cost and schedule deviations and the absence of the represented financial controls—she would not have subscribed to the Partnership or paid the $500,000 Capital Contribution and $55,000 Administrative Fee.

89. The matters Defendants misrepresented or failed to disclose were a substantial and foreseeable cause of Plaintiff's economic loss. The undisclosed Project cost and schedule deviations, inadequate financial controls, depletion of Project resources, and resulting inability of the Project to generate sufficient cash flow and value to satisfy both senior debt and the subordinated EB-5 Loan materially impaired the source from which Plaintiff's capital was to be repaid. The risks concealed or understated by Defendants therefore did not merely coincide with Plaintiff's loss; they materialized in the financial conditions that ultimately prevented repayment of the EB-5 Loan.

90. The undisclosed risks materialized through a series of partial disclosures—the 2023 restructuring disclosure, the 2025 foreclosure notice, and the January 2026 DIL/CPR disclosure. Each disclosure revealed information that had previously been concealed, progressively exposing the risks to Plaintiff's investment and further impairing its value.

91. That impairment became increasingly apparent as the concealed risks materialized. By 2023 and 2024, Defendants disclosed that the Hotel's cash flow was being consumed by outstanding debt service and was therefore unavailable for

meaningful EB-5 interest or distributions. In September 2025, the senior lender commenced foreclosure proceedings based on more than $30 million in unpaid debt. Those proceedings culminated in the transfer of the Project through a Deed in Lieu of Foreclosure and the January 9, 2026 disclosure that EB-5 investors' repayment rights had been replaced or materially impaired by the contingent and deeply subordinated CPR. Collectively, these events constituted the foreseeable realization of the financial risks Defendants had misrepresented or omitted and substantially caused the resulting loss in value of Plaintiff's Partnership interest and repayment rights.

92. Plaintiff has suffered an actual economic loss. She paid $555,000 in connection with her subscription, consisting of a $500,000 Capital Contribution and a $55,000 Administrative Fee. The Project no longer provides the asset or cash flow from which the EB-5 Loan was expected to be repaid, and Plaintiff's remaining CPR is contingent upon satisfaction of the senior lender's approximately $38 million claim, 14% internal-rate-of-return requirement, exit fee, costs, reserves, and other contractual conditions before any CPR distribution becomes available. Any value ultimately realized from the CPR shall be accounted for in determining Plaintiff's net damages.

93. Plaintiff's reliance and Section 10(b) claims are based on both (i) the representations and omissions communicated before and in connection with her December 2017 investment, which induced the original purchase, and (ii) later misrepresentations, omissions, and deceptive acts, including the 2023 restructuring communications, the 2025 regional-center and foreclosure-related communications, and the January 9, 2026 DIL/CPR investor update, that induced Plaintiff to maintain her investment position and forgo available remedies while Defendants continued concealing the material risks. The later conduct is also relevant to Defendants' knowledge, continuing concealment, the materialization and disclosure of the risks previously concealed, Plaintiff's discovery of the alleged misconduct, and the extent

of her resulting loss.

94. Plaintiff seeks actual damages in an amount to be proven at trial, including the loss or impairment of her $500,000 Capital Contribution, the $55,000 Administrative Fee to the extent recoverable, unpaid interest and consequential losses to the extent permitted and proven, prejudgment interest, and all other relief authorized by law.

## CAUSES OF ACTION

### COUNT I: VIOLATIONS OF SECTION 10(b) AND RULE 10b-5; CONTROL-PERSON LIABILITY UNDER § 20(a) (Against All Defendants)

95. Plaintiff repeats and realleges the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

96. Plaintiff's limited-partnership interest in 6417 Dream Lender LP was a security. In connection with Plaintiff's December 2017 purchase of that security, and in connection with her continued ownership and decisions whether to maintain her investment position and pursue available remedies, Defendants HIRC, HIRC 6417 Dream Lender GP, LLC (the "General Partner"), and King used the means and instrumentalities of interstate commerce to make, approve, or disseminate materially false or misleading statements and omissions, and to engage in deceptive acts in furtherance of the scheme alleged herein, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

97. The actionable statements, omissions, and deceptive acts include those particularized in paragraphs 67 through 77 above. Those allegations identify, for each challenged communication, who made or approved it, when and where or through what document or communication it was made, what was said or omitted, and why it was false or misleading. The pre-purchase statements and omissions concern, among other things, the Project's then-current cost and completion status, the represented use and safeguarding of EB-5 proceeds, the existence and adequacy of financial controls, and the Project's capitalization and ability to support the

subordinated EB-5 Loan. The 2023, 2025, and January 2026 communications are also alleged as independent actionable post-purchase statements, omissions, and deceptive acts that furthered the scheme and induced Plaintiff to maintain her investment position and forgo available remedies, without limiting Plaintiff's allegation that the earlier statements and omissions induced the original purchase.

98. HIRC, the General Partner, and King acted knowingly or with deliberate recklessness. By December 2017, the Project's actual completion date and cost were facts directly known to or available to the persons and entities managing the Project and the EB-5 structure, yet the materially outdated offering materials were provided to Plaintiff without correction. The additional facts alleged in paragraphs 78 through 85 further support the required inference of scienter.

99. Plaintiff actually and reasonably relied on the offering materials and the omissions accompanying them in deciding to subscribe and pay her $500,000 Capital Contribution and $55,000 Administrative Fee. Had the material facts been disclosed, Plaintiff would not have purchased the limited-partnership interest.

100. The concealed and understated risks materialized in the Project's inability to generate sufficient value and cash flow to satisfy the senior indebtedness and the subordinated EB-5 Loan, the 2025 foreclosure proceedings, and the January 2026 Deed in Lieu and CPR structure. As a result, Plaintiff suffered the economic loss alleged in paragraphs 86 through 91, subject to credit for any value ultimately received through the CPR or otherwise.

101. King, Heyman, and Five Chairs exercised actual power or control over HIRC and the General Partner, including through the overlapping ownership and management structure alleged above. To the extent HIRC or the General Partner is found liable for a primary violation, King, Heyman, and Five Chairs are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), subject to the statutory defenses. DigitalBridge is not merely an aider or abettor. Plaintiff alleges, in the alternative, that DigitalBridge, as successor in interest to Colony

Capital, LP, and/or its Colony-affiliated entities directly participated in the deceptive conduct alleged herein and are primary violators under Section 10(b), or exercised actual power or control over Relevant Group and other primary violators and are control persons under Section 20(a), subject to the statutory defenses.

**COUNT II: RESCISSION UNDER § 29(b) OF THE EXCHANGE ACT**
**(Against All Defendants)**

102. Plaintiff repeats and realleges the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

103. Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), renders a contract voidable, as against the rights of a person who made or engaged in performance of the contract in violation of the Exchange Act or a rule promulgated thereunder, where the making or performance of the contract involved such a violation.

104. In December 2017, Plaintiff entered into the Subscription Agreement and became a limited partner pursuant to the Limited Partnership Agreement in connection with her purchase of a limited-partnership interest in the Partnership. The Partnership and the General Partner were the direct contractual counterparties: the Subscription Agreement was submitted to and accepted by the General Partner on behalf of the Partnership, and the Partnership admitted Plaintiff as a limited partner pursuant to the Limited Partnership Agreement. The remaining Defendants were not necessarily direct signatories or counterparties to those agreements, but Plaintiff alleges that they made or engaged in the performance of those contracts through their control over and participation in the offering, investor communications, administration, and acceptance of the transaction, as alleged above.

105. As alleged above, Plaintiff was induced to enter into those agreements through material misrepresentations and omissions made in connection with her purchase of the limited-partnership interest, including misrepresentations or omissions concerning the Project's actual cost and completion status, the use and

safeguarding of EB-5 funds, the adequacy of financial controls, and other then-existing facts material to Plaintiff's investment decision. Plaintiff alleges that the making and performance of the Subscription Agreement and Limited Partnership Agreement, including the acceptance and administration of her investment, therefore involved violations of § 10(b) of the Exchange Act and Rule 10b-5.

106. 103. Plaintiff would not have entered into the Subscription Agreement or acquired the limited-partnership interest had the material facts been truthfully disclosed. Plaintiff elects rescission to the extent available and is prepared to restore or tender such interest or rights as the Court determines must be restored as a condition of rescission.

107. Plaintiff elects rescission of the contracts through which she acquired the limited-partnership interest and seeks restitution of the consideration she paid in connection with that transaction, subject to an equitable accounting and credit for any amounts or value Plaintiff has received or ultimately receives. Plaintiff is prepared to restore such interests or rights as the Court determines must be restored as a condition of rescission.

108. Plaintiff seeks rescission and restitution of the consideration she paid in connection with the transaction, subject to an equitable accounting and credit for any income, distributions, or value Plaintiff has received or ultimately receives, together with prejudgment interest and other relief permitted by law.

## COUNT III: FRAUDULENT INDUCEMENT AND FRAUDULENT CONCEALMENT
## (Against HIRC, the General Partner, King, and Heyman)

109. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This claim is pled in the alternative to the federal securities claims.

110. Before and in connection with Plaintiff's December 2017 investment, HIRC, the General Partner, and King represented in the PPM, Limited Partnership Agreement, Loan Agreement, and related offering materials that EB-5 proceeds would be used and safeguarded as represented and that appropriate books, records,

reporting, and financial controls would be maintained. HIRC, the General Partner, King, and Heyman further represented the Project's approximately $96.4 million funding requirement and the capital structure described in the PPM. The time, documents, speakers, and substance of the challenged representations are alleged with greater particularity in paragraphs 67 through 71 above.

111. Those representations were false or misleading, or became materially misleading in light of facts known before Plaintiff subscribed, because the materials were not corrected to disclose the Project's actual completion delay and materially higher completed cost, and because material facts concerning the represented controls, safeguarding of investor funds, and financial condition were concealed or omitted as alleged above.

112. The Defendants named in this Count knew the material facts within their respective areas of responsibility or acted recklessly in representing facts without a reasonable basis, and they intended that Plaintiff and similarly situated investors rely on the offering materials in deciding whether to subscribe. Having chosen to speak about the Project's cost, capitalization, use of funds, and controls, and, in the case of the General Partner, having undertaken fiduciary and contractual responsibilities to the Partnership and its partners, they were required not to conceal material facts necessary to make their statements nonmisleading.

113. Plaintiff reasonably relied on the challenged representations and omissions, subscribed for the limited-partnership interest, and paid $555,000. Had the concealed facts been disclosed, Plaintiff would not have invested on the terms presented.

114. Plaintiff did not discover the facts constituting the alleged fraud until on or about January 9, 2026, for the reasons alleged in paragraphs 21 through 24 and 60 above. Plaintiff therefore pleads delayed discovery under California Code of Civil Procedure § 338(d), as applicable.

115. As a direct and proximate result of the fraudulent inducement and

concealment, Plaintiff has suffered damages according to proof, including loss or impairment of her Capital Contribution and Administrative Fee, subject to credit for any value recovered, and seeks rescissionary and other relief available under California law. Plaintiff also seeks punitive damages against any Defendant for whom the requirements of California Civil Code § 3294 are proven by clear and convincing evidence.

**COUNT IV: DIRECT BREACH OF FIDUCIARY DUTY**
**(Against HIRC 6417 Dream Lender GP, LLC)**

116. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This claim is brought directly under California Corporations Code § 15910.01 to enforce rights and interests belonging to Plaintiff as a limited partner; injuries belonging solely to the Partnership are asserted derivatively in Count X.

117. As the Partnership's general partner, HIRC 6417 Dream Lender GP, LLC owed Plaintiff the duties imposed by California Corporations Code § 15904.08 and the Limited Partnership Agreement, including the duties of loyalty and care and the obligation to discharge its duties and exercise its rights consistently with good faith and fair dealing. The General Partner also owed duties arising from its fiduciary relationship not to make materially misleading partial disclosures to the limited partners concerning matters entrusted to its management.

118. The General Partner breached duties owed directly to Plaintiff by, among other things, failing to provide material Partnership books, records, financial information, and an adequate accounting after request; communicating materially incomplete or misleading information concerning the Partnership's financial condition and prospects; failing adequately to disclose material conflicts affecting decisions made for the Partnership; and exercising its discretion in connection with the 2023 restructuring and the 2025-2026 foreclosure and DIL/CPR process without the candor and good faith required of a fiduciary.

119. To the extent any challenged act caused injury only to the Partnership—

such as loss of the Partnership's loan principal, accrued interest, collateral, or claims—Plaintiff does not seek individual recovery for that injury under this Count and instead asserts it derivatively in Count X.

120. As a direct and proximate result of the breaches alleged in this Count, Plaintiff has suffered direct injury to her rights and interests as a limited partner and is entitled to damages to the extent proven, equitable relief, an accounting, and such other relief as permitted by law.

**COUNT V: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(Against HIRC, the General Partner, King, Five Chairs, HIRC Selma, and Relevant Group)**

121. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This claim is pled in the alternative and is limited to conduct within the applicable limitations period and to relief authorized by the UCL.

122. Within the four years preceding commencement of this action and continuing thereafter, the Defendants named in this Count engaged in unlawful, unfair, or fraudulent business acts and practices in connection with the management of the Partnership and Project, including the alleged breaches of fiduciary and statutory duties, materially incomplete investor communications concerning debt-service capacity and refinancing risk, the conflicted handling of regional-center termination, the foreclosure and DIL/CPR process, and the withholding of material Partnership financial information and records.

123. The challenged practices were unfair because, as alleged, they placed the interests of affiliated managers and control persons ahead of the interests of the Partnership and its investors while depriving investors of material information needed to protect their rights. The challenged communications and omissions were fraudulent within the meaning of the UCL because they were likely to mislead reasonable investors when considered in light of the facts omitted.

124. Plaintiff suffered injury in fact and lost money or property as a result of

the challenged practices. Plaintiff seeks injunctive and other equitable relief under Business and Professions Code § 17203, together with restitution only to the extent Defendants acquired money or property in which Plaintiff has a cognizable ownership interest and the claim for such restitution is timely. Plaintiff does not seek nonrestitutionary disgorgement under the UCL.

**COUNT VI: VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAW OF 1968**
**Cal. Corp. Code §§ 25401 and 25501; and**
**CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750 et seq. (Pled in the Alternative)**
**(Against All Defendants)**

125. Plaintiff repeats and realleges the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

126. Defendants offered, sold, controlled the offer or sale of, and/or materially assisted in the offer or sale of securities consisting of limited-partnership interests in 6417 Dream Lender LP to Plaintiff in California. As alleged above, the offering was made by means of written and oral communications that included untrue statements of material fact and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of California Corporations Code § 25401.

127. The material misrepresentations and omissions included, among other things, those alleged above concerning the Project's actual cost and completion status, capital structure and degree of leverage, use and safeguarding of EB-5 proceeds, books and records, internal financial controls, sources and uses of Project funds, and the financial condition and repayment capacity of the Project at the time Plaintiff was induced to subscribe for her Partnership interest.

128. Plaintiff received the PPM, Limited Partnership Agreement, Subscription Agreement, Loan Agreement, and related offering materials in connection with her December 2017 subscription and reasonably relied upon the material representations and omissions contained in or accompanying those

materials. Plaintiff would not have purchased the limited-partnership interest or paid the associated Administrative Fee had the material facts alleged herein been truthfully disclosed.

129. To the extent any Defendant was a person from whom Plaintiff purchased the security within the meaning of California Corporations Code § 25501, that Defendant is liable to Plaintiff for the remedies provided by § 25501, including rescission upon tender of the security or, if rescission is unavailable or Plaintiff no longer owns the security, damages as provided by statute.

130. Defendants who directly or indirectly controlled a person liable under § 25501, occupied a status or performed functions encompassed by California Corporations Code § 25504, or materially aided in the act or transaction constituting the violation are jointly and severally liable to the extent provided by § 25504. Plaintiff alleges that King, Heyman, Five Chairs, HIRC, the General Partner, Relevant Group, HIRC Selma, and DigitalBridge, as successor in interest to Colony Capital, LP, and its affiliated Colony entities exercised control over, materially aided, participated in, or performed functions in connection with the entities and persons responsible for the offer and sale alleged herein.

131. Plaintiff further alleges that each Defendant who materially assisted in the violation of § 25401 with the intent to deceive or defraud is jointly and severally liable under California Corporations Code § 25504.1. As alleged above, the Defendants responsible for preparing, approving, distributing, or causing the distribution of the offering materials possessed or had access to material Project information concerning the matters misrepresented or omitted and nevertheless caused Plaintiff to be solicited and her investment to be accepted without correcting those representations and omissions.

132. Plaintiff seeks rescission and recovery of the consideration recoverable under California Corporations Code § 25501, including her $500,000 Capital Contribution and, to the extent properly included within the statutory consideration

or otherwise recoverable, the $55,000 Administrative Fee, together with interest at the legal rate, less any income or value received, upon such tender as may be required by § 25501. In the alternative, Plaintiff seeks damages as measured by § 25501 and all other relief permitted under the Corporate Securities Law.

133. In the alternative, and only to the extent that the separately charged Administrative Fee and the administrative, investment-management, regional-center, or related services for which it was charged constitute "services" acquired by Plaintiff for personal, family, or household purposes within the meaning of California Civil Code § 1761, Plaintiff alleges that Defendants' conduct also violated the Consumers Legal Remedies Act, California Civil Code § 1750 et seq.

134. Plaintiff paid a separate $55,000 Administrative Fee in addition to her $500,000 Capital Contribution. Plaintiff alleges that the Administrative Fee was represented as consideration associated with the administration and operation of the EB-5 investment structure and related services and expenses distinct from the $500,000 of at-risk investment capital that was to be deployed to the Project. Plaintiff pleads the CLRA theory in the alternative to her securities-law claims and does not contend that the limited-partnership interest itself is a tangible "good" within the meaning of the CLRA.

135. To the extent the Administrative Fee and associated arrangements constitute covered services under the CLRA, Defendants engaged in unlawful practices under California Civil Code § 1770, including: (a) representing that services had characteristics, uses, benefits, or qualities that they did not have, in violation of § 1770(a)(5); (b) representing that services were of a particular standard, quality, or grade when they were of another, in violation of § 1770(a)(7); (c) advertising services with intent not to supply them as advertised, to the extent established by the evidence, in violation of § 1770(a)(9); and (d) representing that the transaction conferred or involved rights, remedies, obligations, or protections that it did not have or involve, in violation of § 1770(a)(14).

136. Those representations and practices include the representations alleged above concerning the administration and safeguarding of EB-5 funds, maintenance of books and records, financial reporting and internal controls, oversight of the Partnership and Project, and management of investor interests.

137. Plaintiff alleges in good faith and in the alternative that the separately charged Administrative Fee and the services associated with that fee constitute a consumer transaction within the meaning of the CLRA because Plaintiff acquired those services as an individual in connection with her personal immigration and investment objectives and not for a commercial or business use.

138. To the extent Plaintiff has satisfied all statutory prerequisites applicable to a claim for damages under California Civil Code § 1782, Plaintiff seeks the remedies authorized by § 1780, including actual damages, restitution, injunctive relief, punitive damages where otherwise legally available and proven, costs, and reasonable attorneys' fees. To the extent the statutory notice prerequisites for damages have not been satisfied before commencement of this action, Plaintiff seeks presently available non-damages relief under the CLRA and reserves the right to amend her demand for CLRA damages following compliance with § 1782 to the extent permitted by law.

139. As a direct and proximate result of the conduct alleged in this Count, Plaintiff suffered economic injury, including the loss or impairment of her $500,000 Capital Contribution and $55,000 Administrative Fee. Plaintiff seeks the remedies available under the Corporate Securities Law and, in the alternative and without duplicative recovery, such remedies as are available under the CLRA.

## COUNT VII: CIVIL CONSPIRACY
## (Against All Defendants)

140. Plaintiff repeats and realleges the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

141. Defendants agreed, expressly or tacitly, and acted pursuant to a

common plan or design to obtain and retain EB-5 investor capital by misleading investors concerning material aspects of the Project and Partnership, concealing material financial risks and conflicts of interest, maintaining control over an inadequately capitalized and over-leveraged Project for their own economic benefit, withholding material information concerning the Project's deteriorating financial condition, and ultimately resolving the Project's collapse in a manner that Plaintiff alleges prioritized Defendants' interests over the interests they were obligated to protect.

142. The formation and operation of the conspiracy may be inferred from the coordinated conduct, overlapping ownership and management, common economic interests, access to nonpublic Project information, and respective roles of the Defendants alleged throughout this Complaint. The entities responsible for raising, administering, lending, managing, developing, financing, and deploying Plaintiff's EB-5 capital were not operating at arm's length but were controlled, managed, or influenced through overlapping persons and affiliated entities.

143. Each conspirator had an independent or shared economic interest in the common plan beyond the mere performance of ministerial corporate duties. King and Heyman possessed ownership, management, fee, and business interests in the affiliated entities and Project; Five Chairs and Relevant Group possessed economic interests arising from their ownership, development, management, and related activities; HIRC, the General Partner, HIRC Selma, the Partnership, and the Borrower served as entities through which the EB-5 offering, loan, Project administration, and investor communications were implemented; and Plaintiff alleges, on information and belief, that DigitalBridge, as successor in interest to Colony Capital, LP, and/or its Colony-affiliated entities possessed investment, governance, or other economic interests in Relevant Group and the Project as alleged above.

144. Plaintiff further alleges that the conspirators possessed knowledge of

material facts relevant to the common fraudulent objective through their respective roles in the Project and affiliated entities. King, Heyman, HIRC, the General Partner, Five Chairs, HIRC Selma, Relevant Group, and the other participating Defendants had access to information concerning the Project's development, cost, capitalization, financing, operations, use of proceeds, debt obligations, and financial condition that was not available to Plaintiff.

145. In furtherance of the conspiracy, Defendants committed, authorized, assisted, encouraged, or ratified overt acts including, among other things: (a) preparing, approving, disseminating, or causing the dissemination of offering materials containing the false or misleading statements and omissions alleged herein; (b) accepting Plaintiff's investment without correcting material facts concerning the Project that had changed or become known by the time of her December 2017 subscription; (c) failing to implement or maintain the books, records, financial reporting, banking oversight, and internal controls represented to investors; (d) concealing or withholding material information concerning the Project's deteriorating finances, increasing leverage, debt-service limitations, and repayment risk; (e) continuing to exercise centralized and conflicted control over the Partnership and Project while extracting or permitting affiliated fees and economic benefits; (f) failing adequately to disclose the circumstances and risks associated with the 2023 refinancing and restructuring of the EB-5 Loan; (g) terminating or permitting termination of HIRC's regional-center designation while declining to provide the Partnership replacement regional-center sponsorship and without providing investors the material analysis necessary to assess that decision; (h) negotiating, approving, and implementing the deed-in-lieu and CPR transaction while operating under the conflicts of interest alleged herein and without meaningful participation by the limited partners; and (i) concealing, delaying disclosure of, or providing materially incomplete information concerning facts necessary for Plaintiff to discover the nature, scope, and consequences of the misconduct alleged herein.

146. Plaintiff alleges that each Defendant knowingly joined or furthered the common tortious plan and is therefore responsible, to the extent permitted by California law, for actionable torts committed by the other conspirators within the scope and in furtherance of that common design.

147. The conspirators' conduct after Plaintiff's December 2017 subscription is alleged, as applicable, as evidence of the formation and continued operation of the conspiracy, Defendants' knowledge and scienter, continuing concealment, Plaintiff's delayed discovery, the materialization of previously concealed risks, and damages. It is also alleged as independent wrongful conduct that furthered the common plan, induced Plaintiff to maintain her investment position and forgo available remedies, and caused or contributed to her loss. Plaintiff does not rely on statements first made after her December 2017 subscription to establish that the original purchase was induced, but alleges that those later communications independently induced retention and non-exercise of remedies.

148. As alleged above, Plaintiff did not discover the material facts constituting the alleged fraud, concealment, and conspiracy until on or about January 9, 2026. Before that date, material information concerning the Partnership, Project finances, use and disposition of investor funds, foreclosure risk, collateral value, and the deed-in-lieu/CPR transaction remained within Defendants' possession and control and was concealed, withheld, or incompletely disclosed to Plaintiff.

149. The acts committed in furtherance of the conspiracy caused Plaintiff to invest and thereafter impaired the value and repayment prospects of her investment. As a direct and proximate result of the underlying tortious acts committed pursuant to the common plan, Plaintiff suffered the loss or impairment of her $500,000 Capital Contribution, her $55,000 Administrative Fee to the extent recoverable, and other damages according to proof.

150. Accordingly, each Defendant knowingly participated in the conspiracy and is liable as a joint tortfeasor for damages resulting from actionable tortious acts

committed within the scope and in furtherance of the conspiracy, irrespective of whether that Defendant personally committed each underlying act.

151. Plaintiff further seeks punitive damages against each conspirator.

**COUNT VIII: MONEY HAD AND RECEIVED**
**(Against HIRC, the General Partner, the Partnership, and the Borrower)**

152. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This common-law claim is pled in the alternative to the contract and tort theories above.

153. Plaintiff paid $555,000 in connection with her subscription. Through the escrow, Partnership, and loan-advance structure alleged above, the Defendants named in this Count received or obtained the benefit of all or portions of those funds in connection with the challenged transaction.

154. If Plaintiff establishes rescission, fraudulent inducement, or another basis making retention of the consideration inequitable, the Defendants who received or retain money traceable to Plaintiff's payment are obligated in equity and good conscience to restore that money to Plaintiff, subject to credits, tracing, defenses, and proof as to the amount actually received or retained by each Defendant.

155. Plaintiff seeks restitution according to proof, prejudgment interest as permitted by law, and a constructive trust or equitable lien only as to specifically identifiable property or proceeds traceable to funds in which Plaintiff establishes an equitable interest.

**COUNT IX: ACCOUNTING AND ENFORCEMENT OF LIMITED-PARTNER INFORMATION RIGHTS**
**(Against the Partnership and the General Partner)**

156. Plaintiff repeats and realleges the allegations above as if fully set forth herein. This claim seeks equitable and statutory relief in Plaintiff's capacity as a limited partner.

157. California Corporations Code § 15903.04 gives a limited partner rights to inspect specified Partnership information and, subject to the statutory

requirements, to obtain true and full information concerning the state of the Partnership's activities and financial condition. Section 15910.01 further permits a direct action by a partner for legal or equitable relief, with or without an accounting, to enforce the partner's rights and protect the partner's interests.

158. Plaintiff has requested material books, records, financial statements, and information concerning the disposition of EB-5 proceeds, fees paid to affiliated persons and entities, amendments and refinancing of the EB-5 Loan, the foreclosure and DIL negotiations, the CPR and any valuation or expected-value analysis, and the Partnership's remaining assets and claims. The Partnership and General Partner have failed or refused to provide an adequate response and accounting as alleged above.

159. An accounting and production of records are necessary because the relevant transactions span multiple affiliated entities and include information uniquely controlled by Defendants. Plaintiff seeks an order requiring the Partnership and General Partner to provide the records and information to which she is entitled and to render an accounting of the Partnership's funds, assets, liabilities, claims, fees, and rights under or relating to the CPR.

## COUNT X: DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY ON BEHALF OF THE PARTNERSHIP

**(Against King, Heyman, Five Chairs, Relevant Group, and DigitalBridge)**

160. Plaintiff repeats and realleges the allegations above as if fully set forth herein. Plaintiff brings this claim derivatively on behalf of 6417 Dream Lender LP pursuant to California Corporations Code §§ 15910.02 through 15910.05.

161. Plaintiff has been a limited partner continuously since approximately December 6, 2017. This derivative Count is limited to conduct occurring while Plaintiff was a limited partner, including the post-investment administration of the Partnership, the 2018 through 2023 Loan amendments and 2023 refinancing, the handling of the Partnership's financial information and conflicts, and the 2025-2026 foreclosure and DIL/CPR process. Plaintiff does not base this derivative Count on

the Partnership's original 2016 formation or the initial making of the EB-5 Loan.

162. Demand is excused as futile for the reasons set forth above. The General Partner approved, participated in, or implemented the challenged conduct and would be required to cause the Partnership to pursue claims against itself and affiliated persons involved in that conduct. The General Partner is controlled by the very Defendants whose misconduct is the subject of this derivative claim, rendering any demand upon the General Partner a useless formality.

163. King, Heyman, Five Chairs, Relevant Group, and DigitalBridge (as successor in interest to Colony Capital Capital, LP) breached their fiduciary duties to the Partnership by: (a) causing the Partnership to make and maintain a loan under an over-leveraged capital structure that foreseeably could not be repaid; (b) failing to implement adequate internal controls and financial reporting for the Partnership; (c) extracting fees from the Project while the Partnership's collateral deteriorated; (d) unilaterally terminating the regional center, undermining the Partnership's compliance posture; (e) negotiating the deed-in-lieu/CPR on terms that prioritized their personal interests over the Partnership's interests; and (f) failing to pursue alternatives that might have preserved the Partnership's loan value.

164. As a result, the Partnership suffered injury including loss or impairment of the $37,500,000 EB-5 Loan principal and accrued interest on the EB-5 Loan, loss or impairment of collateral and claims, and the substitution of a contingent recovery mechanism for its prior repayment rights. Any recovery on this Count belongs to the Partnership.

165. Plaintiff seeks judgment and equitable relief for the benefit of the Partnership, including damages according to proof, restoration of property or value wrongfully diverted from the Partnership, an accounting, and reasonable expenses and attorneys' fees from any derivative recovery to the extent authorized by California Corporations Code § 15910.05(b).

## REQUEST FOR APPOINTMENT OF RECEIVER

166. As Plaintiff has stated herein, HIRC has been abandoned by those charged with its operations. HIRC's regional center designation has been terminated, and on information and belief, King and the other principals have ceased active management of HIRC's affairs while retaining control over its assets and records. No one at HIRC will hold others to account so that the money of Plaintiff and other investors may be recovered. Likewise, without basic corporate controls in place, HIRC and its affiliated entities may be utilized for further activities that may injure Plaintiff and other investors.

167. Given the substantial risks of harm and further dissipation of assets, and given that Defendants have demonstrated an inability or unwillingness to operate HIRC, the General Partner, and related entities in a manner consistent with their fiduciary obligations, and pursuant to California Code of Civil Procedure § 564, the Court's inherent equitable power, and Federal Rule of Civil Procedure 66, this Court should appoint a Receiver over HIRC and its affiliated entities (including HIRC 6417 Dream Lender GP, LLC and HIRC Selma) to manage their corporate and financial affairs, preserve records, account for the disposition of investor funds, and ensure that any assets or claims belonging to these entities (including the CPR) are administered for the benefit of investors rather than dissipated or abandoned.

## DEMAND FOR JURY TRIAL

168. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Frances Page De La Harpe prays for judgment against the Defendants as follows:

A. Rescission and restitution of the consideration paid by Plaintiff in connection with her investment, including her $500,000 Capital Contribution and, the $55,000 Administrative Fee, under Exchange Act § 29(b), California Corporations Code § 25501, and other applicable law;

B. In the alternative, compensatory and statutory damages in an amount no less than $555,000, which includes return of all capital and administrative fees paid, plus consequential damages including lost interest at the contractual rate of 6.5% per annum from the date of investment, as well as damages recoverable under California Corporations Code § 25501 and damages resulting from the fraud, concealment, fiduciary breaches, conspiracy, and other actionable conduct alleged herein, without duplicative recovery

C. Disgorgement of all management fees, administrative fees, and other ill-gotten gains received by Defendants in connection with the Partnership and the Project;

D. An accounting of all funds received, disbursed, and retained by Defendants in connection with 6417 Dream Lender LP, 6417 Selma Hotel, LLC, and all related entities;

E. Imposition of a constructive trust and/or equitable lien on all assets or property owned or controlled by Defendants King, Heyman, Five Chairs, HIRC, HIRC Selma, and Relevant Group attributable to Plaintiff's investment;

F. Injunctive relief prohibiting Defendants from transferring, dissipating, or encumbering any assets traceable to EB-5 investor funds pending resolution of this action;

G. Punitive damages against each Defendant as to whom Plaintiff establishes by clear and convincing evidence the malice, oppression, or fraud requirements of California Civil Code § 3294, together with all additional statutory requirements applicable to entity liability;

H. Prejudgment interest and post-judgment interest according to proof and as permitted by law;

I. Attorneys' fees and costs awardable under Exchange Act § 29(b), Cal. Corp. Code § 25501, the CLRA (Cal. Civ. Code § 1780(e)), and any other applicable statute;

J. The immediate appointment of a Receiver over HIRC, HIRC 6417 Dream Lender GP, LLC, and HIRC Selma, so that any judgment obtained in this case is not rendered ineffectual and so that investor assets and claims (including the CPR) are preserved;

K. Restitution under Business and Professions Code § 17203;

L. Such other and further relief as the Court deems just and proper.

Dated: August 27, 2026 **Law Offices of Robert V. Cornish, Jr., PC**

*/s/ Hadjar Anahita Ohadi*
Hadjar Anahita Ohadi

*Attorneys for Plaintiff*
*Frances Page De La Harpe*